# OCTOBER TERM, 1923.

SACKNER *v.* SACKNER.

1. DIVORCE—EXTREME CRUELTY—EVIDENCE—SUFFICIENCY.
   In husband's suit for divorce on the ground of extreme cruelty, evidence *held*, to sustain a decree in his favor.

2. SAME—ALLOWANCES NOT DEDUCTED FROM PERMANENT ALIMONY.
   In view of plaintiff's financial circumstances, ability, and business prospects, having due regard to his ability and the character and situation of the parties, and all the other circumstances of the case, including the fact that plaintiff also appealed, the monthly allowance to defendant pending appeal, and the cost of procuring testimony from the stenographer, and printing the record and briefs of her counsel allowed her by a former order of this court, will not be deducted from the amount of alimony allowed her by the lower court, as provided in said order. WIEST, C. J., and BIRD, J., dissenting.

Appeal from superior court of Grand Rapids; Brown (William B.), J., presiding. Submitted January 3, 1923. (Docket No. 26.) Decided October 26, 1923.

Bill by Wade Sackner against Adelle Sackner for a divorce. From a decree for plaintiff, both parties appeal. Affirmed.

*Wicks, Fuller & Starr*, for plaintiff.
*J. T. & T. F. McAllister*, for defendant.

STEERE, J. The parties to this chapter of domestic infelicity are persons of middle age, married in Chicago, June 15, 1905, and are residents of Grand

For a discussion of the question of condonation as affecting suit for divorce, see note in 6 B. R. C. 589.
On charge of adultery as cruelty in action for divorce, see notes in 18 L. R. A. (N. S.) 303; 34 L. R. A. (N. S.) 360.

Rapids, Michigan, where, with the exception of two years spent in Chicago, plaintiff has resided since 1893 and is now president of the Grand Rapids Fibre Cord Company, a successful manufacturing business of which he is the principal stockholder. Defendant's maiden name was Adelle Barofsky. The record discloses nothing of her antecedents. No issue was born of their marriage. Owing, as he then alleged, to her habitually unwifely conduct, turbulent abuse in frenzied fits of unfounded jealousy and repeated acts of extreme cruelty, he left their home and her in October, 1915, and began a suit for divorce in the Kent county circuit court, in chancery. During its pendency they were separated for about a year when, as he alleges, on her repeated protestations of love and affection with solemn promises that if he would withdraw his suit and return to her she would so conduct herself that he would have no further ground for complaint, he complied with her solicitations and they resumed their domestic relations.

On March 10, 1920, he again left her in possession of their home in Grand Rapids, secured lodging elsewhere in the city and filed this bill on similar grounds of extreme and repeated cruelty, charging in detail numerous specific incidents, to which she answered in denial with counter accusations, consisting mainly of charges of improper conduct with other women, and denying their reconciliation was as he claimed, but on the contrary was on condition that she surrender to him a compromising letter he had written to a certain married woman which fell into defendant's hands, and upon his promise to "cut out all other women absolutely," dismiss his bill, live with her, make his will in her favor and conduct himself toward her as a wife should be treated.

At the hearing defendant introduced in evidence what she testified was a photographic copy of this

letter and testified that the original which she had surrendered to him came to their home in July, 1916, inclosed in an envelope mailed from Jamestown, N. Y., addressed to plaintiff himself, all in his own handwriting and written on stationery of the Samuels hotel, of Jamestown, N. Y. The copy shows a letter without date or signature and mentions no names but begins "My Dearie," whom defendant claimed from its contents to identify as a married woman of their acquaintance living near by them, and testified that plaintiff admitted he was the author. The letter was particularly stressed in her behalf as sustaining her counter charges and justifying her subsequent suspicions and treatment of him. Plaintiff denied it was his handwriting, that he ever wrote such a letter, ever made any admissions, or had any knowledge in regard to it. We do not disagree with the conclusions of the trial judge that—

"The imagination must be appealed to in following this letter transaction. * * * If the letter existed as claimed by defendant, and if the letter was intended for a third party, as implied, the letter is more or less of an enigma. * * * One would have to go outside of the letter, get things presumed which the letter does not state, by inference or innuendo or direct allegation, to find that there was anything more serious or improper intended by the letter than what might be said to be familiarity, * * * From the testimony in the case, so far as I remember it, if there had been any undue freedom between the plaintiff and the person for whom the defendant says the letter was intended, there is nothing in the case showing that it has been continued in any way since that time, and the fact the entire matter was adjusted by the parties, this letter is out of the case."

Taking as true whatever defendant claims for this letter, on her theory written and inadvertently mailed to himself by plaintiff, it was fully known to and condoned by her when they became reconciled and re-

sumed their marital relations, which she stated was on July 15, 1916.    Plaintiff testified that it was not until the following winter, which the record of dismissal of his bill on November 9, 1916, tends to confirm.

The directly important issues in this case are defendant's conduct and treatment of plaintiff after their reconciliation.    He had spent most of his life in Grand Rapids, apparently recognized as a responsible citizen of good social and business standing, interested in its civic and social activities.    It is shown that he frequently took his wife out to public and private entertainments, and social gatherings at private homes, amongst friends and neighbors.    We find no complaint on her part of neglect in those particulars. When they resumed their marital relations they moved from their former home on Pleasant street to the lower apartment of a two-family house on Fuller avenue. He states as the reason for the change:

"We had practically worn out our circle of acquaintances where we had been before, through trouble, and I thought by going into a new circle of acquaintances we would get along better.    But trouble immediately started with the Billings who lived the next door neighbor, an insurance agent."

This trouble which he tried to smooth over was caused by defendant's anger at, as she claimed, Mrs. Billings not inviting her to a card party she was about to give of which she had talked to defendant and plaintiff and for which she had borrowed some chairs from them.    Mrs. Billings claimed they had been invited, but defendant profanely refused to be reconciled and later in talking with plaintiff about Mrs. Billings called her vile names and swore at him. This early incident, of relatively minor importance in itself, was followed by various other outbursts of anger with accusations against plaintiff in public and

private, under humiliating circumstances to him. Illustrative of such conduct, on an occasion when plaintiff had been away on a three days' fishing trip, during which he wore some old clothes taken from his office, and had no occasion to unpack a satchel he took along, as he relates, she bitterly accused him on his return of not having left town and spending the time he was absent from home in bed with another woman. The aftermath to this private charge of marital delinquency took place at the Pantlind hotel where she went with plaintiff to call on a business acquaintance and his wife from out of town who were stopping there. During the call she took occasion to regale them with an account of how her husband had returned from a claimed trip out of town with all his linen in his grip as he had taken it from home and said, as the other man present relates—

"she couldn't arrive at any other conclusion but what he had been out with some woman, and was in bed all the while, and therefore didn't soil any linen. Mr. Sackner was right there and got up from his chair where he was sitting and said he wouldn't stand for any such talk, and started for the door and asked her to accompany him home."

The testimony of various witnesses of apparent standing and respectability is convincing that defendant was not only of a suspicious and jealous disposition which she at times publicly displayed in outbursts of angry and profane vituperation, but her home life and habits were such as furnished him just cause for complaint. After they moved to Fuller avenue the apartments above them were occupied by a Mrs. Kendall and her daughter Mae Kendall, who was a circuit court reporter of Kent county. They testified to her using profane language, smoking cigarettes and receiving men callers late at night in her husband's absence. Of one of the men who called frequently and stayed

late during the summer of 1920, Miss Mae Kendall testified that when he called he would go quickly in and "try to shield himself by putting his hat over his face;" that defendant smoked cigarettes and she had heard her use oaths when angry.

Of plaintiff's conduct in his home she said:

"During the time I was there I never heard Mr. Sackner use any profane language or conduct himself in any way than that of a gentleman."

Of defendant's smoking and other home habits the mother, Mrs. Kendall, testified:

"She said she had smoked as high as two packages of cigarettes a day. She said she had to do it to quiet her nerves. I have heard her use profane language in her home. In a way I have heard her use vulgar language. * * * The front part of Mrs. Sackner's house looked very passable, but the back part looked very filthy, her kitchen. I would go so far as to say the kitchen was very filthy; and she is very slack about herself."

Plaintiff was an officer and at one time president of the Business Men's Exchange Club of Grand Rapids, member of a Masonic lodge and during the war a block chairman in the Liberty Loan drive. She objected to his attending meetings of those bodies, called up the master of the Masonic lodge to which he belonged and wanted him expelled because of immoral conduct she charged against him, spoke to others in derogatory terms of the members of the Exchange Club and, as he testified, refused to assist him in his work during Liberty Loan drive, saying the Americans "were just as bad if not worse than the Germans." This she denied. Her jealous fits of angry accusation appear to have taken a wide range. One time she charged him with improper conduct toward office girls in his factory and at another with both married

and single women of their social acquaintance. On different occasions she visited the factory and there so conducted herself toward plaintiff as to seriously disturb his management of the business. She at one time accused him of improprieties with a Miss Barnes, an employee in the office, who shortly thereafter resigned and left on account of the attitude of defendant. A Miss Spoelstra, who also worked in the office, testified that defendant had ransacked the drawers and desks in plaintiff's office in his absence and conducted herself around there in such an offensive manner that certain of the employees quit. One of the culminating causes of plaintiff leaving his home and filing this bill was defendant's jealous and bitter attacks in public and private upon him and a Miss Frances Freeman, a stenographer and bookkeeper who had been on the office force of the company for several years and held the position of secretary and treasurer. When she first commenced working for the company its business was such that she handled its stenographic work and bookkeeping alone. As the business grew and the office force increased she continued in charge of the bookkeeping, looked after the cost and order systems, attended to much of the correspondence and the income tax reports, putting in a bookkeeping system adapted to its demands. She apparently bore a good reputation and was regarded as a competent and valued employee. Defendant became jealous of her, charged that she was unduly intimate with plaintiff and trying to break up her home, threatened to kill both her and plaintiff, demanding of her that she quit her employment and of plaintiff that she be discharged. Of Miss Freeman's character and ability Mr. Fred A. Maynard, a reputable attorney and prominent in his profession, testified:

"I was attorney also for the Grand Rapids Fibre Cord Company; I am a director in that company, I

own one share.    I am acquainted with Miss Freeman. I have always felt that Miss Freeman was almost invaluable in that office in a business way.    She came to me after this suit was commenced with her mother to ask my advice.    It was in regard as whether or not she should stay there, and I certainly advised her to stay. * * *

"A. I knew perfectly well what a splendid woman she was over to the factory, and what a good woman she is, and what a fine young lady she is; I knew that."

When plaintiff left defendant and filed this bill he obtained an injunction restraining her from visiting the factory of the Fibre Cord Company, interfering with its books, records or files and from molesting or threatening Miss Freeman, its employee, and from contracting indebtedness on plaintiff's credit.

Defendant admitted the writ of injunction was served on her and she understood its contents, but said she "didn't pay any attention to that injunction."    She later went to the factory about 7 o'clock one evening in plaintiff's absence when Miss Freeman was at work in the office preparing some amended income tax reports, broke in the outer door with an axe which she had borrowed from a Polish groceryman near by and then smashed the door of the wash room into which Miss Freeman had fled, ordering her with oaths to come out or she would kill or shoot her, as Miss Freeman testified.    She then ordered her to get her coat and hat and go with her saying, as defendant testified, "I am going to take you to your mother." She then started down the street with Miss Freeman in custody past a crowd of people whom the disturbance she made had attracted.    Of what immediately followed defendant related:

"We had walked a half block east.    Miss Freeman says 'I'm going to faint.'    I said 'Go ahead and faint.' She sat on the grass and laid her head on the grass.

She said, 'Mrs. Sackner, what are you doing to me?' I said, 'What have you done to me for three years?' A great crowd had collected and she laid there on the ground for some time.

"Q. About how long?

"A. Possibly about 8 or 10 minutes."

The testimony was taken in open court and the trial judge, who heard and saw the various witnesses for the respective sides touching the relations of plaintiff with Miss Freeman, said in connection with that feature of the defense:

"This case is unusually free from evidence against the plaintiff of any improper conduct. If there is any improper conduct on his part to be determined or found from the evidence, it is from inference solely."

No facts or fair inference of criminal relations between those parties which would afford defense against or ground for divorce are shown or suggested beyond that not unknown type of conjugal inference inspired by jealousy and based on bare opportunity where female office help is employed by a suspected spouse.

Upon the hearing, though not mentioned in the pleadings of either party and on the initiative of defendant's counsel in plaintiff's cross-examination, the testimony was led at length into an unwholesome inquiry touching venereal ailments, in which defendant accused plaintiff of having and by inference of communicating to her a loathsome disease which was strenuously denied by him, the disgusting details of which may best be passed with the following excerpts from the oral opinion of the trial court:

"The plaintiff has put his doctor upon the witness stand and the doctor has testified, under cross-examination, without objection, to the entire physical condition of the plaintiff, and we have the benefit of his testimony. * * * We have the testimony of the plaintiff that two doctors have examined him by Wasserman test and that he is found to be negative.

We have the testimony of the physician who was a witness, that there are no clinical or subjective developments or evidence of any venereal disease upon the plaintiff. The defendant testifies that she treated his back for sores which, the inference is, were syphilitic ulcers two or three inches in diameter. The testimony of the physician is that he finds no scars whatever. It is a matter of common knowledge that the ordinary flesh wound from the ordinary accident, if there is the least septic difficulty in the wound, leaves a scar when it is healed, and I think it is reasonable to conclude that syphilitic ulcers leave their scar, and their depression and scar tissue wherever they occur.

"Generally speaking, other things being equal, it may be said, that the person who discloses all, so far as he is able, is entitled to a greater degree of credit on a certain subject than the one who suppresses facts or does not disclose all they are able to disclose."

The testimony also shows that as late as 1920 plaintiff passed a satisfactory physical examination for life insurance in the Massachusetts Mutual Life Insurance Company and received its best policy, his Wasserman tests both ways showing negative results.

Defendant gave the time when she treated these sores on plaintiff's back as in 1912, before their first separation, but continued the repulsive story through the period following their resumption of marriage relations in 1916. If plaintiff is the cruel, diseased and loathsome creature she paints him, her assertions that she contests divorce through love of him and her desire for reconciliation with resumption of their marital relations taxes credulity.

Plaintiff has established the grounds for divorce alleged in his bill by a clear preponderance of convincing evidence. We are not prepared to disturb the conclusions of the trial court that defendant has not negatived them by such convincing proof of her recriminating charges as preclude the relief asked.

The record shows that after the trial court had

announced to counsel for the respective parties that a decree be granted plaintiff, they conferred together at the court's suggestion on the subject of alimony, fees, etc., and reached an adjustment, announced in open court, pursuant to which the court decreed that plaintiff should pay defendant in lieu of dower, etc., $13,000, her attorney's fees to the amount of $2,000 and awarded her their household goods and effects then in her possession, except certain personal effects of plaintiff. Both parties have appealed. Plaintiff's reasons for so doing are left to conjecture, as his counsel ask and argue in their briefs that the decree of the lower court he affirmed as rendered.

On her application to this court after appeal the court continued her allowance of $100 per month during pendency of the case and required plaintiff to pay the cost of procuring testimony from the stenographer, printing the record and briefs of her counsel, with a provision that in case the decree of the lower court was affirmed such payments should be deducted from the amount of alimony allowed her. Upon review of the testimony showing plaintiff's financial circumstances, ability and business prospects, having due regard to his ability "and the character and situation of the parties and all the other circumstances of the case," including the fact that plaintiff also appealed, we conclude that the payments made under order of this court by plaintiff should not be deducted from the permanent alimony allowed defendant by the lower court.

Its decree will therefore stand affirmed, without further costs in this court to either party.

FELLOWS, MCDONALD, CLARK, SHARPE, and MOORE, JJ., concurred with STEERE, J.

WIEST, C. J. (*concurring*).    I am in accord with the opinion affirming the decree, but think defendant

224—Mich.—40.

should be held to abide the order of this court granting her expense money, and, therefore, the cost of procuring testimony from the stenographer, printing the record and briefs of her counsel, should be deducted from the amount of alimony allowed her.

BIRD, J., concurred with WIEST, C. J.