KENNEDY *v.* KENNEDY.

1. Divorce—Extreme Cruelty—Statutes.
   Since statute providing for divorce on ground of extreme cruelty does not define cruelty, the determination thereof must be made from the facts and circumstances in each case (3 Comp. Laws 1929, § 12729).

2. Same—Extreme Cruelty—Jealousy—Unwarranted Accusations.
   Uncalled-for jealousy on part of wife and her unwarranted accusations of improper relations with other women *held*, to constitute extreme cruelty, entitling husband to divorce (3 Comp. Laws 1929, § 12729).

3. Same—Extreme Cruelty—Appeal.
   On appeal from decree dismissing husband's bill and wife's cross-bill for divorce, where testimony is such that Supreme Court would have reached a different result had it occupied the position of the trial court and wife's testimony does not sustain material allegations of her cross-bill nor entitle her to a divorce but evidence does establish ample ground for granting divorce to husband because of extreme cruelty, divorce is awarded husband.

4. SAME—SUPPORT—EXPENSES OF SUIT—WIFE'S ATTORNEYS' FEES.
    Upon granting divorce to husband after marriage lasting nearly
    16 years, where he received a very substantial salary, defend-
    ant has not had recent business experience, no children were
    born of such marriage although he, but not she, had a child
    by previous marriage, husband is ordered to provide a reason-
    able support and maintenance subject to modification or
    change depending upon circumstances of the parties, also a
    reasonable sum for wife's attorneys' fees and expenses neces-
    sarily incurred by her in connection with suit and appeal.

Appeal from Ingham; Carr (Leland W.), J.
Submitted June 11, 1942. (Docket No. 77, Calendar
No. 41,062.) Decided September 8, 1942.

Bill by Alfred P. Kennedy against Jeannet Ken-
nedy for an absolute divorce. Cross-bill for an
absolute divorce or separate maintenance. Bill and
cross-bill dismissed. Plaintiff appeals and de-
fendant cross-appeals. Reversed and decree
granted plaintiff.

*Pierce, Planck & Ramsey,* for plaintiff.

*Kelley & Seelye,* for defendant.

STARR, J. Plaintiff and defendant both appeal
from a decree entered January 10, 1939, dismissing
plaintiff's bill of complaint and defendant's cross-
bill for divorce.

These parties were married in June, 1922, and
lived together until about April, 1938. Both had
been previously married. Plaintiff's first wife had
died and defendant had divorced her first husband.
Plaintiff had a son, by his first marriage, who was
about three years old at the time of the marriage
to defendant. Defendant had no children by her
first marriage and no children were born of the
present marriage.

In May, 1938, plaintiff began suit for an absolute

divorce on the grounds of extreme and repeated cruelty. He alleged, in substance, that defendant evidenced extreme and absurd jealousies and on one occasion threatened another woman with physical violence; that she unjustly accused him of improper relations with another woman; that she circulated stories among their friends that the other woman was breaking up their home; that she embarrassed him in his employment, had been deceitful in money matters, had, against his wishes, repeatedly contracted indebtedness and had borrowed sums of money from his business associates and friends.

Defendant filed answer and cross-bill, denying plaintiff's charges against her and alleging extreme and repeated cruelty on the part of plaintiff. In her cross-bill she asked for an absolute divorce or for separate maintenance. Defendant alleged, among other things, that plaintiff had threatened her; that he had threatened to take his own life; that he had taken trips and vacations without inviting her to accompany him; that he had shown a lack of affection for her and stated his preference for another woman. She further alleged plaintiff had stated that she was insane and should be in an institution; that he had been unduly friendly and intimate with another woman; that he had caused her mental distress and unhappiness, had failed to provide her (defendant) with necessities, reasonable luxuries, recreations, and advantages, and had been extremely selfish and self-centered. Plaintiff filed reply denying the charges against him.

The case was tried in November, 1938. The trial court's opinion stated in part:

"The proofs in the case have been quite extended, and a discussion of all of the details of the marital difficulties of the parties as brought out in the evidence is scarcely feasible. In any event it would serve no useful purpose. I am brought to

the conclusion that the situation that has come to pass has resulted from the acts of both, neither being free from serious fault. Such being the case it cannot be said that either is entitled to a decree of divorce. Neither has shown freedom from fault contributing to the breaking up of the home.''

A decree was entered January 10, 1939, dismissing both plaintiff's bill of complaint and defendant's cross-bill. Both parties appeal from such decree.

3 Comp. Laws 1929, § 12729 (Stat. Ann. § 25.87), provides that a divorce from bed and board ''may be decreed for the cause of extreme cruelty, whether practiced by using personal violence, or by any other means.'' Such statute does not define cruelty and the determination thereof must be made from the facts and circumstances in each case. *Brewer* v. *Brewer*, 295 Mich. 370; *Whitman* v. *Whitman*, 286 Mich. 458.

Both parties were nearly 50 years of age at the time of the trial. When they were married, in 1922, plaintiff was employed as buyer in a Detroit store, and defendant worked for him or under his direction. Plaintiff later held executive positions in stores in other cities. They moved to Lansing 8 or 10 years prior to the trial. Plaintiff testified that defendant was a good housekeeper and had taken good care of his child. There had, apparently, been no serious family discord until two or three years prior to the present divorce proceeding.

Plaintiff was employed as merchandise manager of a large department store in Lansing. The store also employed ten or more men and women as buyers of merchandise. It was customary and necessary for plaintiff, as merchandise manager, and for the buyers to make many trips each year to the markets in New York and Chicago. The other

woman in the case, about whom defendant complains and whom we will refer to as Miss X, was buyer for 19 departments of the store. Miss X and also other buyers usually accompanied plaintiff on the trips to New York and Chicago.

The record indicates that defendant and Miss X were quite intimate friends until about three years prior to the present suit. Miss X testified that the friendship ended when she refused defendant's request for a loan of $300. Defendant apparently became extremely jealous of Miss X and accused her of attempting to break up the home of the parties. She continually complained about plaintiff and Miss X going together on merchandise buying trips. Defendant testified "I thought Miss X was an enemy of mine, that she was doing everything she could to hurt me." Defendant insisted that Miss X be discharged from the department store. She complained about Miss X to Mr. George Arbaugh, manager of the corporation owning the department store. She complained about Miss X to employees of the store, and to a minister whom she interviewed and to other persons. From the testimony it may fairly be inferred that she became obsessed with jealousy toward Miss X. She accused plaintiff of buying a fur coat and a bedroom suite for Miss X, although there is no testimony supporting such accusation. There is no testimony indicating immoral relations between plaintiff and Miss X and, in fact, defendant testified "Really, I have not mistrusted him up to date." Defendant also complained about plaintiff's conduct with other women. She complained to a Lansing minister, who testified:

"She told me that he (plaintiff) was an unfaithful husband and that he had been engaged in improper relations with a certain Miss X, a person whom I

did not know. It had reached especially to the buying trips where these improper relations are alleged to have taken place. She told me that there were others, who were trying to influence or perhaps were influencing Mr. Kennedy in his actions toward her."

In *Sackner* v. *Sackner,* 224 Mich. 615, 623, we considered a somewhat similar situation regarding the wife's jealousy toward the husband's female employee. In that case we said:

"No facts or fair inference of criminal relations between those parties which would afford defense against or ground for divorce are shown or suggested beyond that not unknown type of conjugal inference inspired by jealousy and based on bare opportunity where female office help is employed by a suspected spouse."

Plaintiff received a very substantial salary. He apparently provided defendant with a good home, ample clothing, and paid most of the bills of the home. He testified that he attempted to operate the home on a cash basis and not to incur bills or indebtedness. He gave defendant $20 a week for the purchase of groceries and some incidentals about the home. This would not appear to be a liberal allowance in view of plaintiff's income. However, the matter of such allowance was not the principal disturbing influence in the marital relations of these parties. Considerable friction arose from defendant's incurring miscellaneous bills and indebtedness without plaintiff's consent or knowledge, and which he was eventually obliged to pay.

Trouble also arose from defendant's habit of borrowing or attempting to borrow money from the officials and employees of the department store where plaintiff worked and from other persons. She endeavored to borrow $500 from Mr. George Arbaugh.

She asked Mr. Frank Arbaugh to loan her several hundred dollars. She borrowed $150 from the family doctor. She borrowed money from the personnel manager of the store, and from Miss X, and from plaintiff's tailor. She was always insistent that the party from whom she borrowed or attempted to borrow money did not inform plaintiff. Plaintiff was obliged to pay certain of such loans made by defendant.

Plaintiff accuses his wife of deceitfulness in connection with money matters, bills and indebtedness incurred by her and loans which she obtained. On one occasion plaintiff, desiring to make settlement of a claim against him, arising out of a real-estate transaction, made deposits from time to time in defendant's name in a postal savings account. When he attempted to withdraw such accumulated fund he discovered that defendant had personally drawn out $400. When confronted with such withdrawal defendant stated that she had loaned the money to her sister. Later she confessed that such statement was not true and that she had used the money herself.

The testimony indicates that defendant often went to the department store where plaintiff worked. She apparently created some trouble among the employees as she admits that the store manager, Mr. George Arbaugh, requested her not to come in the store and to do her shopping in Detroit or Grand Rapids. Defendant wrote Mr. George Arbaugh complaining about Miss X. Mr. Arbaugh testified in part:

"I have been asked by Mrs. Kennedy to loan her money on just one occasion. * * *

"She told me that her sister in Royal Oak had borrowed from her, around $500 or $550, I don't recall, I think it was between $500 and $600, and

that she had drawn this money out of the postal savings, which was a joint account between Mrs. Kennedy and Mr. Kennedy, and that when Mr. Kennedy discovered it that he was very angry and she believed that it might mean a separation.

"She named the amount that she wanted me to loan to her. I think it was around $500. * * *

"Mrs. Kennedy hinted at improprieties between Miss X and Mr. Kennedy. She always ended up her conversation by saying she trusted Mr. Kennedy. She always said that Mr. Kennedy was a wonderful husband and that he was always being more or less influenced by Miss X.

"I do not recall that she ever made any accusation directly that there was an affair between them.

"She talked about going to New York, Miss X and Mr. Kennedy, and that she did not believe it looked right. I used to try to explain to Mrs. Kennedy that that was a part of Mr. Kennedy's job, that it was important and it was vital to the store that he did make these trips with the buyers, that he not only would go with Miss X, but numerous other buyers.

"It is a fact that he (plaintiff) was required to make such trips. It is customary in department stores to have the merchandise managers accompany buyers to market. That is a part of their job.

"I never observed any impropriety of any sort between Miss X and Mr. Kennedy. In my work in the store I am thrown into daily contact with them. We work very close together."

Mr. Frank Arbaugh testified in part:

"Mrs. Kennedy tried to borrow money from me. * * *

"She came to me personally and also wrote a letter. * * *

"The letter stated, in substance, that she was in dire need of about $500 and the conversation brought out the fact, so she stated, that the purpose of the loan was for some relative of hers, or her

mother or friend who lived on a farm, I think in Ohio.

"I did not loan her the money. * * *

"I have been on such (buying) trips with Mr. Kennedy and Miss X, among others. * * * The trips to New York are rather frequent and extensive.

"It is the common practice for buyers from the store to stay at the same hotel and eat meals together and spend the evening together and so forth. That is the practice encouraged by the store management. It is a practice that I used myself when I was performing the functions that Mr. Kennedy is now performing in the store, that of merchandise manager. * * *

"There absolutely was never anything that I have seen that was improper or questionable between Mr. Kennedy and Miss X.

"I have been familiar with the work that Miss X has done as a buyer. The reason for the fact that she now has 19 departments under her, is due to her efficiency and ability, nothing else, so far as I would know."

The testimony does not support defendant's accusations of improper conduct and relations between plaintiff and Miss X or with other women. Such uncalled-for jealousy and unwarranted accusations certainly constituted extreme cruelty. In *Gindorff* v. *Gindorff*, 295 Mich. 469, 470, Mr. Justice CHAN-. DLER said:

"The cruelty claimed by plaintiff consists of * * * uncalled-for jealousy and false and unwarranted accusations by defendant as to plaintiff's relations with other women. Proof of these allegations would entitle him to a divorce for we have consistently held such conduct to constitute extreme cruelty."

Plaintiff admits that he finally lost all affection for defendant and frankly told her 'that he thought more of the store and his work ànd position than he

did of her. The record, particularly defendant's own testimony, is quite convincing that her own conduct caused plaintiff to lose his affection for her.

Defendant testified as to many incidents which she contends constituted cruelty on the part of plaintiff. The majority of such incidents were trivial. Upon careful reading, her testimony is not particularly convincing. Much that she said was colored with animus and jealousy. There is some indication that she may have found ego satisfaction in picturing herself as the martyred and wronged wife in the alleged human triangle of plaintiff, Miss X, and herself.

The relation between plaintiff and defendant became so strained that plaintiff and his son left their home in about April, 1938, and thereafter resided in an apartment hotel. It is apparent that continued marital relations between these parties are impossible. They both ask for their freedom. There are no small children involved. It would serve no useful purpose further to narrate the conflicting testimony as to the charges and counter charges made by these parties.

The trial court, in summarizing the testimony, said in part:

"Defendant unquestionably knew that plaintiff did not wish her to contract debts, especially without his knowledge. However, she persisted in doing so notwithstanding the expressions of displeasure on his part, which she now alleges to be extreme and repeated cruelty. She attempted to negotiate loans, and in some instances succeeded, from plaintiff's business associates. She contracted debts of which plaintiff had no knowledge until requested to make payment. At one time, the date not being fixed specifically by the record but being approximately four years ago, plaintiff, acting on the advice of

an attorney, undertook to create a fund with which to settle litigation that had been instituted with reference to a Detroit real-estate transaction. By agreement the money was deposited in a postal savings account in defendant's name. Without plaintiff's knowledge defendant drew out $400, presumably using the same for purposes not disclosed by the record. When plaintiff subsequently learned of such withdrawal defendant advised him that she had loaned the money to her sister, a statement that she now admits to have been not in accordance with the actual fact.   *   *   *

"To what extent defendant's jealousy prompted her to indulge in conduct of which she knew plaintiff did not approve is largely a matter of conjecture. Doubtless it had its effect.

"The record as made does not justify the conclusion that there was actually reprehensible conduct between plaintiff and the other employee (Miss X) of the store above referred to. The nature of the employment of each was such as to put them into rather close association, especially on buying trips that the proofs indicate were taken from time to time, usually with other employees. Apparently, however, defendant became suspicious and her feelings were greatly intensified by an anonymous telephone call that she received on one occasion. Apparently she was not given any specific information in such conversation as to misconduct on plaintiff's part, but was merely given what purported to be a 'friendly' warning. That the party making such anonymous call was actuated by malice is of course obvious. However, defendant allowed herself to be greatly wrought up and thereafter insisted from time to time that plaintiff should cause the discharge of the other employee in question. *   *   *

"While, as indicated above, the record does not justify the conclusion that plaintiff was actually guilty of improper conduct in connection with the

association that caused defendant's jealousy, it is obvious that he did not undertake in any way to alter the situation of which defendant complained."

The trial court found both parties at fault and that neither was entitled to a decree of divorce. However, we believe that we would have reached a different conclusion had we occupied the position of the trial court under like circumstances. The testimony presented by and in behalf of defendant does not sustain the material allegations of her cross-bill and does not entitle her to a divorce. From a careful review of the entire record we are satisfied that the evidence establishes ample grounds for granting plaintiff a decree of divorce.

We recognize that defendant, because of her age and lack of recent business experience and connections, would find it difficult, if not impossible, to support and maintain herself. Plaintiff should provide her with reasonable support and maintenance. The amount awarded defendant for her support and maintenance should be subject to modification or change from time to time, depending upon the circumstances of the parties. Plaintiff should also pay a reasonable amount for defendant's attorneys' fees, and should pay expenses necessarily incurred by her in connection with this suit and appeal.

The decree of the trial court dismissing plaintiff's bill of complaint is reversed and a decree may be entered, granting plaintiff a divorce. Such decree shall provide for remanding the case to the circuit court for determination of the property rights of the parties, for defendant's support and maintenance, and for her attorneys' fees and expenses.

CHANDLER, C. J., and BOYLES, NORTH, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred. WIEST, J., did not sit.